2021 IL App (1st) 200126-U

FIRST DISTRICT,
FIRST DIVISION
December 20, 2021

No. 1-20-0126

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| ALBERT CAMPASANO, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| v. | ) | |
| | ) | |
| THOMAS KOSTER, as Trustee of the Koster Family Irrevocable Trust, Dated January 30, 1993, | ) ) | |
| | ) | Appeal from the |
| Defendant-Appellee. | ) | Circuit Court of |
| _____ | ) | Cook County, Illinois. |
| | ) | |
| THOMAS KOSTER, | ) | No. 14 CH 13676 |
| | ) | |
| Counter-Plaintiff, | ) | Honorable |
| v. | ) | Anna H. Demacopoulos, |
| | ) | Judge Presiding. |
| ALBERT CAMPASANO, | ) | |
| | ) | |
| Counter-Defendant, | ) | |
| and | ) | |
| | ) | |
| SOPHIE PASCO[1], | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

_____

JUSTICE COGHLAN delivered the judgment of the court.

_____

[1] Her name is misspelled in the caption; "Sophia Pasko" is the correct spelling.

Justices Pucinski and Walker concurred in the judgment.

## ORDER

¶ 1    *Held*:    (1) Plaintiff failed to make a *prima facie* case for age discrimination in the sale of housing. (2) Award of fees under the Human Rights Act was not an abuse of discretion. (3) In counterclaim for slander of title, plaintiff's filing of a *lis pendens* on the subject property was not absolutely privileged where plaintiff's suit did not make allegations affecting an ownership interest in the property.

¶ 2    Plaintiff Albert Campasano, 82 years old, brought suit against defendant Thomas Koster alleging age discrimination in the sale of real estate in violation of the Human Rights Act (775 ILCS 5/3-102 (West 2012)) (Act). Koster filed a counterclaim for slander of title. Following a bench trial, the trial court entered a directed finding for Koster on Campasano's age discrimination claim and entered judgment in favor of Koster on his counterclaim. The court awarded Koster $11,509 in damages plus $48,780.87 in attorney fees. Campasano appeals both judgments and the award of attorney fees. For the reasons that follow, we affirm.

¶ 3                                         BACKGROUND

¶ 4    The following evidence was presented at the bench trial.[2] In 2011, Koster inherited his mother's residential property at 4657 North Orange Avenue in Norridge, Illinois (the property). It remained vacant until July 8, 2014, when Koster hired a realtor, Lee Stahnke, to put it on the market for a listing price of $292,000.

¶ 5    In addition to price, Koster had three criteria for selling the property. He wanted a closing date in August and an "as-is" sale so he would not have to perform repairs. He also wanted to leave behind some personal property in the house to make things easier for himself. He explained this verbally to Stahnke, though she did not include it in the house's Multiple Listing Service

---

[2] Although Campasano testified at the bench trial, no court reporter was present during his testimony in his case-in-chief, nor is there any bystander's report or agreed statement of facts. The record does contain Campasano's testimony during the proceedings on Koster's counterclaim.

(MLS) listing, since buyers might perceive an as-is clause as a "red flag" and the other criteria would not normally be included in a house listing.

¶ 6      On July 12, Stahnke received an offer of $315,000 with a closing date of August 28 (the Ogrodny offer). Although the contract did not contain an as-is clause, Koster accepted the offer on the same day.

¶ 7      The next day, July 13, there was an open house at the property. Despite Koster's acceptance of the Ogrodny offer, Stahnke and Koster decided to proceed with the open house because it had already been scheduled and would help to "drum up business" for Stahnke. Koster did not attend. Midway through the open house, Stahnke received a call that the Ogrodny buyers were backing out of the deal, and she told the open house visitors—which included Campasano—that the house was back on the market.

¶ 8      On July 14, Campasano met with Koster to discuss buying the property. Also present for their meeting was Campasano's friend Sophia Pasko. According to Koster, he told Campasano to go through his real estate agent, and "[t]hat's basically it." He denied making any comments about Campasano's age or his ability to care for the property. According to Pasko, Koster asked why Campasano wanted to buy "such a big house," since its upkeep was expensive and time-consuming, and he asked Campasano's age. When Campasano said that he was 83, Koster replied, "I'm in my 60s, and I already have heart problems, and anything can happen." Koster also stated that he wanted to leave possessions in the house—a condition to which Campasano agreed—and that he intended to sell it for "top dollar," though he would not give a figure and instead directed Campasano to speak with Stahnke.

¶ 9      Later that day, Campasano and Pasko went to meet Stahnke at her office, and Campasano made an offer of $292,000 in cash. According to Stahnke, Campasano proposed an October 14

closing date so he would have time to get the funds. Stahnke explained that her client wanted an August closing and said, "You are not going to get the house if you have an October closing date." Stahnke further testified that Campasano was unwilling to take any personal property with the house. She could not recall if they discussed the house being sold as-is, and she denied asking about his age or his ability to maintain the property.

¶ 10        According to Pasko, when Campasano proposed a closing date of October 14, Stahnke did not inform him that Koster wanted an earlier date. Campasano also told Stahnke that it would be "[n]o problem" to take Koster's personal property. As to the condition of the house, Stahnke said that "this is not an as-is house. It's well maintained. Everything works."

¶ 11        The next day, Campasano came to Stahnke's office and raised his offer to $315,000. When Stahnke told Campasano that he was still not going to get the house with an October 14 closing date, he changed the date to October 14 "or sooner."

¶ 12        Koster considered Campasano's offer alongside two others, the Badali offer and the Pablo offer. Although Campasano's price was acceptable, his offer did not meet Koster's other criteria. On July 15, Koster accepted the Pablo offer, which was for the same price ($315,000) with an August 29 closing date and buyers who were willing to take the house as-is and keep "everything" in the house. The record does not state the Pablo buyers' age or whether they were a couple, and neither Stahnke nor Koster had met them in person as of July 15.

¶ 13        Later that week[3], Koster met Campasano and Pasko outside the property. According to Koster, Campasano "browbeat" him about not accepting his offer. Koster denied commenting that he wanted the home to go to a younger family. According to Pasko, however, Koster told

---

[3] The parties disagree as to whether this meeting occurred on July 15 or 18.

Campasano that he did not sell him the house because: "You're 83. It takes a lot of work and a lot of money to maintain a house like this. You're too old. I want to sell it to a young couple."

¶ 14    Campasano retained counsel for the purpose of "stop[ping] the sale of the home" to the Pablo buyers. On August 22, 2014, Campasano, through counsel, filed the instant suit against Koster, alleging age discrimination in the sale of real estate in violation of the Human Rights Act (775 ILCS 5/3-102 (West 2012)). Campasano also filed a *lis pendens* against the property on the same date.

¶ 15    Koster learned about the *lis pendens* on the day it was filed; it was his understanding that it precluded him from honoring the Pablo contract. When the Pablo buyers experienced a delay in getting their mortgage paperwork processed, Koster "took a hard line" and used the delay as a reason to terminate the contract because "otherwise [he] would have two contracts, so [he] would be getting sued two different ways." Koster testified that he later offered to sell Campasano the property on the same terms as his July 14 offer, but no agreement was reached. Campasano denied any such discussions.

¶ 16    On December 13, 2014, Koster filed his answer and a counterclaim against Campasano and Pasko for slander of title.[4] Koster alleged that Campasano "placed an unlawful cloud on the title of the Property" by recording an "unlawful and/or improper" *lis pendens* on the property. He alleged damages in that he was unable to sell the property to other interested buyers and he was incurring costs to maintain the property and remove the cloud on its title.

¶ 17    Eight months later, on August 10, 2015, the trial court ordered that Campasano be given the opportunity to inspect the property "to determine if he wishes to purchase the property." On

---

[4] Koster's counterclaim also contained counts to quiet title and for tortious interference with a contract, but he voluntarily dismissed the former, and the trial court entered judgment in Campasano's favor on the latter. Neither is at issue in this appeal.

August 28, in open court, the parties executed a purchase contract for $315,000 requiring Campasano to deposit $5000 in earnest money that same day. However, Campasano refused to deposit the earnest money despite multiple inquiries from Stahnke over the next week. Koster filed an emergency motion to require Campasano to release his *lis pendens*. On September 14, the trial court issued an order that if the purchase transaction did not close by October 14, Campasano would have to release his *lis pendens*. On October 13, 2015, Campasano purchased the property.

¶ 18    The case proceeded to a bench trial on May 21 to 24, 2018. (Campasano had not moved into the property by the time of trial.) The trial court entered a directed finding in favor of Koster on Campasano's age discrimination claim, finding "no evidence whatsoever" that Koster refused to engage in a real estate transaction with Campasano or that Campasano was ready and able to purchase the property in July 2014. It stated that Campasano's readiness was refuted by his own testimony that he needed additional time before closing because "unless he sold his stock *** he did not have cash ready."

¶ 19    Regarding Campasano and Pasko's credibility, the court stated:

"[T]his Court has to consider the demeanor of Mr. Campasano and the demeanor of Ms. Pasko during their testimony. Both of them had been impeached by prior inconsistent statements in their depositions. In addition, when confronted on cross-examination, both of them were hesitant to answer questions, and this Court is greatly concerned about the fact that both of them as it relates to this particular transaction were adamant that Mr. Campasano should have gotten this deal because he was the highest bidder ***. There's no way they could have known that.

Mr. Campasano wants this Court to believe that *** Mr. Koster inquired as to his age, either on the 14th or on the 18th of July. Based on the credibility of Mr. Campasano and Ms. Pasko and the fact that they have acted in concert throughout this entire transaction and there has been sufficient evidence that they have acted in concert in the past, *** this Court is making a credibility finding that those statements were not in fact made."

Even if Koster had made such statements, the court found no evidence that they influenced Koster's acceptance of the Pablo contract, since the age of the Pablo buyers was not in evidence.

¶ 20    The trial court also found in favor of Koster on his counterclaim for slander of title. It found "no question" that the *lis pendens* constituted a disparagement of title. It also made a credibility decision that Campasano acted with malice in filing the *lis pendens*, since he had the opportunity to buy the property and release the *lis pendens* yet chose not to do so. The court found that Campasano kept the *lis pendens* "for one reason and one reason only, to hurt Mr. Koster." The court awarded Koster $11,509 in damages and invited him to file petitions for fees incurred (1) in prosecuting the counterclaim against Campasano and (2) as the prevailing party in Campasano's age discrimination action under section 10-102 of the Human Rights Act (775 ILCS 5/10-102 (West 2012)).

¶ 21    Koster filed a petition seeking $67,793.37 in combined fees from the counterclaim and the age discrimination action, of which Campasano filed a motion challenging $19,120.50. Following a hearing, the trial court granted Campasano's challenge in its entirety and awarded Koster the remaining $48,780.87. At the request of Campasano's counsel, the trial court allocated that sum entirely as fees incurred in the age discrimination action rather than the counterclaim.

¶ 22                                                    ANALYSIS

¶ 23        Campasano argues that (1) the trial court's directed finding in favor of Koster on the age

discrimination claim is against the manifest weight of the evidence; (2) the award of fees in favor

of Koster is unwarranted and excessive; and (3) judgment for Koster on his counterclaim for

slander of title was erroneous as a matter of law. Although Koster did not file an appellate brief,

we will consider the appeal on Campasano's brief alone. *First Capitol Mortgage Corp. v.*

*Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 24        Initially, Campasano's testimony in his case-in-chief is not in the record on appeal, nor is

there any bystander's report or agreed statement of facts describing his testimony. It is the

appellant's duty to present a proper record on appeal so we have an adequate basis for our

review. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 156 (2005). If the gap in the record

could impact our decision, we will presume the missing evidence supported the trial court's

judgment. *Id.* at 157; *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App.

3d 437, 445-46 (2007).

¶ 25                                   Campasano's Age Discrimination Claim

¶ 26        Campasano first argues that the trial court's directed finding for Koster on the age

discrimination claim was against the manifest weight of the evidence. In ruling on a motion for

directed verdict in a bench trial, the trial court does *not* view the evidence in the light most

favorable to the plaintiff, but weighs *all* the evidence to determine whether the plaintiff has made

a *prima facie* case. 735 ILCS 5/2-1110 (West 2018); *Orbeta v. Gomez*, 315 Ill. App. 3d 687, 690

(2000). Since the trial judge has a superior opportunity to assess witness credibility, we will not

reverse its findings based on conflicting testimony unless a contrary finding is clearly apparent.

*Kroot v. Chan*, 2017 IL App (1st) 162315, ¶ 19.

¶ 27    For a *prima facie* case of housing discrimination on the basis of age, plaintiff must show that (1) he was over 40, (2) defendant was aware of that fact, (3) plaintiff was "ready and able" to accept defendant's offer of housing, and (4) defendant refused to deal with plaintiff. 775 ILCS 5/1-103(A) (West 2012); *Hsu v. Human Rights Comm'n*, 180 Ill. App. 3d 949, 953 (1989). If plaintiff establishes these elements, the burden shifts to defendant to show a legitimate reason for refusing to deal with the plaintiff. *Hsu*, 180 Ill. App. 3d at 953-54. Plaintiff then bears the burden of showing defendant's reason is pretextual. *Id.* at 954.

¶ 28    The trial court's determination that Campasano failed to establish a *prima facie* case of age discrimination is not against the manifest weight of the evidence. The court found that Campasano was not ready and able to purchase the property based upon his admission in his testimony that he did not have cash ready and needed to delay the closing to October to sell stock and obtain the needed funds. Since Campasano's testimony is not in the record, we must presume it supports the trial court's judgment. *Corral*, 217 Ill. 2d at 157.

¶ 29    The trial court also found no evidence that Koster refused to deal with Campasano. On the contrary, when Campasano expressed interest in the property on July 14, 2014, Koster invited him to speak with Stahnke. Later that day, Campasano visited Stahnke's office to make a $292,000 offer, and the next day he visited again to increase his offer to $315,000. Stahnke testified credibly that she told Campasano that he would not get the property with his proposed October closing date. As to Koster's alleged comments regarding Campasano's age and his desire to sell the property to a younger couple, the court made a credibility determination that these comments were "made up" by Campasano and Pasko and "were not in fact made." In light of the trial judge's superior opportunity to observe the witnesses and their demeanor on the

stand, the court's conclusions are not against the manifest weight of the evidence. See *Kroot*, 2017 IL App (1st) 162315, ¶ 19.

¶ 30        Campasano argues that his offer was objectively superior to the Pablo offer because it was $3000 higher, citing Pasko's testimony to that effect. But as the trial court astutely observed, "[t]here's no way [Pasko] could have known that." On the contrary, the signed contract admitted into evidence, as well as Koster and Stahnke's testimony, establishes that the Pablo offer was for $315,000—*i.e.*, the same as Campasano's offer. Campasano's speculation that the Pablo buyers would not have been able to obtain financing is without support in the record. Moreover, the record does not reflect the age of the Pablo buyers, and it is undisputed that neither Koster nor Stahnke had met them in person prior to Koster's acceptance of their offer.

¶ 31        Accordingly, we find no error in the trial court's finding that Campasano failed to make a *prima facie* case for age discrimination and its directed verdict for Koster.

¶ 32                                    Award of Attorney Fees

¶ 33        Campasano next argues that the trial court abused its discretion in awarding Koster $48,780.87 in attorney fees incurred in defending the age discrimination claim.

¶ 34        Section 10-102 of the Human Rights Act provides that the court, in its discretion, may award fees and costs to the prevailing party. 775 ILCS 5/10-102(C)(2) (West 2012). This fee-shifting provision is intended to enforce the public policies behind the Act (*Mendez v. Town of Cicero*, 2016 IL App (1st) 150791, ¶ 14) and is analogous to the fee-shifting provision of Title VII of the Civil Rights Act of 1964, which was enacted to protect defendants from "burdensome litigation having no legal or factual basis." (Internal quotation marks omitted.) *Habitat Co. v. McClure*, 301 Ill. App. 3d 425, 447 (1998). We review the court's decision for an abuse of

discretion, meaning that we affirm unless the decision is arbitrary, fanciful, or unreasonable. *Mendez*, 2016 IL App (1st) 150791, ¶ 15.

¶ 35     We find no error in the trial court's award of fees. The court found that Campasano, the complainant, acted "in concert" with Pasko to fabricate allegedly discriminatory statements by Koster that "were not in fact made." The court also found that Campasano recorded a *lis pendens* on the property "with malice" and "for one reason and one reason only, to hurt Mr. Koster." Under these facts, the award of fees was not an abuse of discretion.

¶ 36     *Habitat*, 301 Ill. App. 3d at 447, in which we reversed a trial court's award of fees under the Act, is distinguishable. In *Habitat*, a landlord sued for possession of a tenant's apartment following termination of his lease. The tenant countersued under the Act, alleging discrimination on the basis of mental handicap. *Id.* at 429. We affirmed judgment for the landlord on the counterclaim, finding legitimate, nonpretextual reasons not to renew the tenant's lease, but we did not find an award of fees appropriate, since "all that can be said of the litigation, in our view, is that [the tenant] failed to carry his burden of proof at trial." *Id.* at 446. Here, by contrast, the trial court rendered a credibility finding that Campasano and his accomplice "made up" allegations about their dealings with Koster and Stahnke that formed the backbone of Campasano's discrimination claim. An award of fees under these circumstances serves the public policies behind the Act. *Mendez*, 2016 IL App (1st) 150791, ¶ 14.

¶ 37     Campasano also argues that the trial court's award of fees is excessive because the award of $48,780.87 includes both fees incurred in the age discrimination action and in Koster's counterclaim. But it is well established under the invited error doctrine that a party may not request to proceed in one manner and then contend on appeal that the course of action was in error. *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 63. Here, Koster's fee

petition sought $67,793.37 in combined fees. Campasano filed a motion challenging $19,120.50 of those fees, which the court granted in its entirety. Campasano's counsel then asked how the court would allocate the remaining $48,780.87 between the age discrimination action and the counterclaim, and the following discussion occurred:

> "THE COURT: You are asking in paragraph 13 that no fees be awarded for slander of title?
>
> [CAMPASANO'S COUNSEL]: Correct. If the Court is going to award the 48 for the human rights, I get that.
>
> THE COURT: That's what I am going to do.
>
> [CAMPASANO'S COUNSEL]: Perfect."

Thus, Campasano cannot now complain that the allocation of fees was improper.

¶ 38                           Koster's Claim for Slander of Title

¶ 39        Campasano argues that the trial court erred in entering judgment for Koster on his slander of title claim because Campasano's *lis pendens* was not a "false and malicious" publication and he had an "absolute privilege" to record a *lis pendens* against the property in the course of judicial proceedings.

¶ 40        In a slander of title action, plaintiff must prove that (1) defendant made a false and malicious publication (2) that disparaged title to the plaintiff's property and (3) resulted in damages. *Chicago Title & Trust Co. v. Levine*, 333 Ill. App. 3d 420, 424 (2002); see *American Nat'l Bank & Trust Co. v. Bentley Builders, Inc.*, 308 Ill. App. 3d 246, 252 (1999) (maliciously recording a document that clouds another's title to real property is actionable as slander of title). Here, Campasano recorded a *lis pendens* on the property, which is a notice that the property in question is involved in litigation. *Kurtz v. Hubbard*, 2012 IL App (1st) 111360, ¶ 15. Any

subsequent purchasers of the property are deemed to have constructive notice of the litigation and will be bound by the proceedings as if they were parties. 735 ILCS 5/2-1901 (West 2010).

¶ 41     Defamatory statements are absolutely privileged in a narrow class of cases " 'where the public service, or due administration of justice, requires that a party speak his mind freely, and no action can be maintained therefor even though the words be false or maliciously spoken.' " *Razavi v. Walkuski*, 2016 IL App (1st) 151435, ¶ 13 (quoting *Young v. Lindstrom*, 115 Ill. App. 239, 245-46 (1904)). Such privilege extends to statements "required or permitted by law in the course of judicial or quasi-judicial proceedings." *Razavi v. School of the Art Institute of Chicago*, 2018 IL App (1st) 171409, ¶ 22. In *Ringier America, Inc. v. Enviro-Technics, Ltd.*, 284 Ill. App. 3d 1102 (1996), we considered whether the filing of a *lis pendens* in conjunction with a civil action was privileged. In the underlying suit, plaintiff sued defendants for breaching a contract to purchase the subject property. Defendants countersued, alleging that plaintiff was the breaching party, and filed a *lis pendens* on the property. The suit and countersuit were both dismissed. Plaintiff then filed suit for slander of title, arguing that the *lis pendens* was a false and malicious statement filed "for the sole purpose of clouding title to the property so as to interfere with plaintiff's ability to sell it." *Id.* at 1104.

¶ 42     Under these facts, we found defendant's filing of a *lis pendens* to be absolutely privileged because "the underlying litigation makes allegations affecting some ownership interest in the subject property." *Id.* at 1106. We additionally found the *lis pendens* did not constitute a false and malicious statement, since it "accurately inform[ed] its reader of the existence of the counterclaim." *Id.*

¶ 43     *Ringier* is distinguishable because Campasano's suit did not "make[] allegations affecting some ownership interest in the subject property." *Id.* at 1106. Unlike the defendant in *Ringier*,

Campasano had no contractual claim to the property. Although the Act permits the court to grant "any permanent or preliminary injunction" as relief (775 ILCS 5/10-102(C)(1) (West 2012)), which would include a compelled sale, Campasano's prayer for relief in his complaint does not ask the court to order Koster to sell him the property. Moreover, as the trial court observed, Campasano knew that the Pablo contract was terminated in August 2014, but he did not reach out to Koster to purchase the property, nor did he seek the assistance of the court to enforce his rights under the statute. He did nothing until August 10, 2015, nearly a year later, when the trial court ordered he be allowed to inspect the property to determine "if" he wished to purchase it. Even then, he continued to delay the purchase transaction until the court ordered on September 14, 2015 that if he did not purchase the property, he would have to release his *lis pendens*. Under these facts, we do not find Campasano's filing of a *lis pendens* to be absolutely privileged.

¶ 44      As to the requirement of a "false and malicious" publication, the critical inquiry is whether Campasano had reasonable grounds to believe he had a claim to the property. *American Nat'l Bank*, 308 Ill. App. 3d at 252. In light of Campasano's conduct during the course of the litigation, the trial court made a credibility determination that Campasano had no such grounds, but acted with malice in filing his *lis pendens* "for one reason and one reason only, to hurt Mr. Koster." We do not find the trial court's determination to be against the manifest weight of the evidence. See *Kroot*, 2017 IL App (1st) 162315, ¶ 19 (trial court's credibility determination will not be reversed unless a contrary finding is clearly apparent). Accordingly, we affirm the trial court's judgment for Koster on his counterclaim for slander of title.

¶ 45      CONCLUSION

¶ 46      For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 47      Affirmed.